UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOPCO INTERMEDIATE HOLDINGS, INC., a Delaware corporation, and HOPCO GROUP HOLDINGS, L.P., a Delaware limited partnership,<br><br>    Plaintiffs,<br><br>  v.<br><br>CLIFFORD JONES,<br><br>    Defendant. | Case No. |

## COMPLAINT FOR BREACH OF CONTRACT

Plaintiffs HOPCo Intermediate Holdings, Inc. ("Intermediate Holdings") and HOPCo Group Holdings, L.P. ("Group Holdings," together with Intermediate Holdings "HOPCo Holdings Entities" or "Plaintiffs"), by and through their undersigned counsel, allege the following against Defendant Clifford Jones ("Dr. Jones" or "Defendant"):

## NATURE OF THE ACTION

1. HOPCo Holdings Entities bring this action for Dr. Jones's repeated and several breaches of a Restrictive Covenant Agreement entered into July 18, 2019 (the "RCA,") and a Rollover Agreement also entered into July 18, 2019 (the "Rollover Agreement," together with the RCA the "Agreements").

2. In July 2019, in connection with a Merger Agreement and Transaction between The Center for Orthopedic and Research Excellence, Inc. d/b/a Healthcare Outcomes Performance Company ("CORE"), CORE's shareholders including Dr. Jones, Intermediate

Holdings, and Group Holdings (the "Merger Agreement"), Dr. Jones entered into the RCA, where he expressly agreed to abide by the obligations therein.

3. In addition, Dr. Jones and the other CORE shareholders also chose to roll over proceeds from the Merger in a tax-advantaged structure. In particular, Dr. Jones rolled over $655,930.60 of his $692,345.89 CORE stock proceeds to purchase partnership units in Group Holdings as part of a tax-deferred transaction contemporaneous with the Merger. In consideration for these partnership units, Dr. Jones again agreed to abide by the provisions set forth in the Rollover Agreement.

4. A mere three (3) months after signing the Agreements, Dr. Jones abruptly resigned in October of 2019. Shortly thereafter, HOPCo Holdings Entities learned that Dr. Jones had joined Dignity Health Medical Group in Phoenix Arizona, a direct competitor of CORE, as the Chief of Orthopaedics Surgery.

5. Under the RCA, in exchange for "a significant direct ownership interest," Dr. Jones agreed that for a period of three (3) years following the close of the Merger and within a twenty-five mile radius of any CORE or affiliated entity location, he would not "engage or undertake any affirmative steps to engage, either individually or with others and whether directly or indirectly, in the practice of medicine [ ] in any field of medicine that is the same as, or substantially related to, any field of medicine" in which Dr. Jones provided services to CORE or any of its affiliated entities. Additionally, Dr. Jones agreed not to "Participate In [ ] or undertake any affirmative steps to Participate In, any business which engages (or has taken affirmative steps to engage) in a Competing Business in any geographic area in which" CORE or any of its affiliated entities "is conducting business or actively planning to conduct business" for a period of three (3) years following the closing date of the Merger.

6. Likewise, under the Rollover Agreement, Dr. Jones elected to roll over the substantial majority of his CORE stock proceeds to purchase units in Group Holdings and agreed not to "own, manage, control, participate in, or otherwise permit" his name to be used "by, consult with, render services for or otherwise assist anyone who owns, invests in, manages, controls, or engages in all or any portion of the business" that CORE conducts or engages within a twenty-five mile radius of any CORE or affiliated entities' locations for a period of three (3) years following the closing date of the Merger.

7. Dr. Jones has breached, and continues to breach, his contractual obligations set forth in the RCA and Rollover Agreement. With a clear understanding and acknowledgment of his obligations, Dr. Jones joined Dignity Health Medical Group in Phoenix, Arizona, which is well within the proscribed geographic area under both the RCA and Rollover Agreement.

8. As a direct result of Dr. Jones's contractual breaches, HOPCo Holdings Entities have incurred substantial damages associated for which it seeks redress, as alleged below.

## THE PARTIES

9. Plaintiff HOPCo Intermediate Holdings, Inc. is a Delaware corporation with a principal place of business in Boston, Massachusetts. Intermediate Holdings is a subsidiary of Group Holdings and was incorporated on July 2, 2019. As part of the Merger, CORE was merged into Intermediate Holdings.

10. Plaintiff HOPCo Group Holdings, L.P. is a Delaware limited partnership with a principal place of business in Boston, Massachusetts and was incorporated on July 2, 2019. Group Holdings is governed by the Amended and Restated Limited Partnership Agreement ("LPA"), dated July 17, 2019. As part of the Merger, Intermediate Holdings became a 100% wholly owned subsidiary of Group Holdings.

11. Defendant Dr. Clifford Jones is an individual who, on information and belief, resides in Phoenix, Arizona.  As part of the Merger and Rollover Agreement, Dr. Jones became an investor in Group Holdings.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction over HOPCo Holdings Entities' claims in this matter pursuant to 28 U.S.C. § 1332, in that the matter in controversy is between parties that are diverse and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13. This Court has jurisdiction over the parties and HOPCo Holdings Entities' claims in this matter pursuant to the parties' express consent to submit to the personal and subject matter jurisdiction of this Court under the RCA and Rollover Agreement.  RCA §7(j); Rollover Agreement §§ 9 ("LP Agreement"), 11.1 ("Governing Law).  Both Agreements also provide that the Agreements should "be governed by and construed in accordance with the domestic substantive laws of the State of Delaware." RCA § 7(i); Rollover Agreement § 11.1.

14. Venue is proper in this district because Dr. Jones agreed that venue for any action concerning the RCA and Rollover Agreement, through the LPA, shall be the state or federal courts in Delaware.

## FACTUAL BACKGROUND

15. The CORE Institute[1] has for many years delivered the best in orthopedic and neurological care through pioneering research, academics, and community service.  It is a multi-disciplinary orthopedic specialty provider delivering start-to-finish services focusing on bone health, hand and upper extremity care, foot and ankle care, hip and knee care, neurology, and

---

[1] The Center for Orthopedic Research and Education, LLC d/b/a The CORE Institute.

sports medicine. The physicians at the CORE Institute are fellowship-trained specialists in their respective fields. They are nationally recognized leaders, experts, researchers, and educators in orthopedic surgery and musculoskeletal medicine.

16. The CORE Institute began in 2005 as a three-physician practice with a mission to change the way orthopedic care was offered to their community. Driven through a commitment to excellence, innovation, and learning, The CORE Institute expanded over the next fifteen years to numerous locations across Arizona and Michigan and undertook strategic partnerships with healthcare groups to provide superior orthopedic, neurological, and physical therapy care to its growing patient base.

17. Dr. Jones became an employee of The CORE Institute in April of 2015 and a stockholder in The CORE Institute.[2]

18. The CORE Institute is professionally managed by CORE, which is a physician-operated healthcare management company focused on transforming the patient experience and practice of medicine through the use of proprietary IT platforms and standardized protocols.

**I. The Merger**

19. In July 2019, new private equity investors were brought on in order to assist CORE growth its platform nationally.

20. As part of the Merger, CORE became a wholly owned subsidiary of Intermediate Group, which in turn became a wholly-owned subsidiary of Group Holdings.

---

[2] Three years later, in December 2018, Dr. Jones became a stockholder in CORE as part of a Contribution and Purchase and Sale Agreement (supra n. 1).

21. As a material condition of the Merger Agreement, Dr. Jones and the other stockholders of The CORE Institute agreed to enter into the RCA. *See* Merger Recitals p. 1, RCA Recitals ¶ 7.

22. In addition, a majority of eligible physician stockholders of The CORE Institute, including Dr. Jones opted to enter into the Rollover Agreement as detailed below.

## II. The Restrictive Covenant Agreement

23. Dr. Jones entered into the RCA on July 18, 2019 in connection with the Merger.

24. The RCA confirmed that, among numerous other contractual obligations, Dr. Jones (and the other CORE Stockholders) would not compete or interfere with the business of any of Intermediate Holdings subsidiaries or affiliated entities should he choose to leave his employment with CORE in exchange for "substantial benefits from the consummation of the [Merger]."

25. Under Section 2 of the RCA, Dr. Jones agreed that he would not, in any capacity:

- "solicit, contact or communicate with any business partner, supplier, vendor, client, distributor, licensor or licensee" of – or any person or entity having a material business relationship or prospective business relationship with— CORE or any of its affiliated entities or subsidiaries or encourage any of the aforementioned entities to alter his, her, or its relationship with CORE for a period of three years following the termination of Dr. Jones's relationship with Intermediate Holdings;

- "engage or undertake any affirmative steps to engage . . . in the practice of medicine . . . in any field of medicine that is the same as, or substantially related to, any field of medicine in which" Dr. Jones had provided services to CORE or

       any of their affiliated entities or subsidiaries within a 25-mile radius of any CORE-affiliated entities or subsidiaries for a period of three years following the termination of Dr. Jones's relationship with Intermediate Holdings; and

- "Participate In (as defined [in the RCA]), or undertake any affirmative steps to Participate In, any business which engages in (or has taken affirmative steps to engage) in a Competing Business" of any CORE-affiliated entities or subsidiaries within any geographic area in which any CORE-affiliated entities or subsidiaries conduct business.

26. In the RCA, Dr. Jones expressly acknowledged that "[he held] a significant direct ownership interest in [CORE], possess[ed] or ha[d] access to valuable Confidential Information" of CORE-affiliated entities and subsidiaries. RCA, Recitals ¶ 4.

### III. The Rollover Agreement

27. Dr. Jones entered into the Rollover Agreement on July 18, 2019 in connection with the Merger.

28. In electing to enter into the Rollover Agreement, Dr. Jones (and numerous other CORE stockholders) accepted the opportunity to roll over the proceeds from the Merger to purchase partnership units in Group Holdings in a tax advantaged structure. As such, Dr. Jones elected to roll over $655,930.60 of the $692,345.89 in CORE stock proceeds to purchase partnership units in Group Holdings.

29. In consideration for these partnership units, access to business partners, trade secrets, and other Group Holdings confidential information, Dr. Jones explicitly agreed to abide by the (numerous) contractual obligations arising under the Rollover Agreement.

30. Pursuant to Section 7.3 of the Rollover Agreement, and in exchange for participation in a tax-deferred transaction, which was highly beneficial to Dr. Jones, Dr. Jones explicitly acknowledged that he had "access to trade secrets and other Confidential Information, which if disclosure or used for any reason unrelated to the furtherance of [Group Holdings'] business, could unfairly and inappropriately assist in competition against [Group Holdings]." Consequently, Dr. Jones agreed that he would not, in any capacity:

- "invest in, own, manage, control, participate in, or otherwise permit [Dr. Jones's] name to be used by, consult with, render services for, or otherwise assist, in any manner" anyone that "owns, invests in, manages, controls, or engages in all or any portion of any business" that any Group Holdings-affiliated entities or subsidiaries engages in within a 25-mile radius of any Group Holdings-affiliated entities or subsidiaries for a period of twelve months following the date upon which Dr. Jones ceased all ownership of Group Holdings stock; and

- Provide medical services within a 25-mile radius "of any facility owned or managed by any Group Holdings-affiliated entities or subsidiaries for a period of three-year period.

31. Under the Rollover Agreement, Dr. Jones expressly acknowledged that "restrictions on [his] activities . . . are necessary, appropriate and reasonable to protect the goodwill, Confidential Information and other legitimate interests of [Group Holdings] and its Subsidiaries, from unfair and inappropriate competition[.]"

### IV. Dr. Jones's Abrupt Departure

32. Overnight on of October 18, 2019, Dr. Jones quit via email. He did not provide any information as to his plans for the future and whether or where he would be employed.

33. As part of his Employment Agreement, Dr. Jones agreed to a 60-day transition period. His last day as an employee of CORE was December 16, 2019.

34. Nearly a month later, on January 14, 2020, Dr. Jones—through counsel—requested CORE provide verification of his dates of employment with CORE required by his as-yet undisclosed new employment. Despite CORE's requests, neither Dr. Jones nor his counsel informed CORE of the identity of his new employer.

35. Upon information and belief, Dr. Jones began his employment with Dignity Health Medical Group in Phoenix, Arizona ("Dignity Health") as the Chief of Orthopaedics Surgery on January 3, 2020.

36. Dignity Health describes itself as "an academic medical group" comprised of 30 "practice sites and four hospitals interspersed throughout the valley."[3] It's Orthopedic group provides an array of services related to orthopedic trauma and fracture care, sports medicine, foot and ankle surgery, shoulder and elbow surgery, sports medicine, and hand surgery.[4]

37. Dignity Health Orthopedics is a direct competitor of The CORE Institute and other HOPCO Holdings Entities-affiliated entities and subsidiaries.

---

[3] https://www.dignityhealth.org/about-us
[4] https://www.dignityhealth.org/about-us/dignity-health-international/keyclinicalprograms/orthopedics

## COUNT I: BREACH OF CONTRACT

### (NON-COMPETITION CLAUSE- RCA, INTERMEDIATE HOLDINGS GROUP AGAINST JONES)

38. Plaintiff repeats and realleges the factual allegations in Paragraphs 1 through 37 above.

39. Dr. Jones breached and continues to breach Section 2 of the RCA by, and without Intermediate Holdings' prior permission or consent, undertaking employment with Dignity Health, in competition with CORE.

40. The actions of Dr. Jones constitute material breaches of the RCA.

41. As a result of Dr. Jones's breaches, Intermediate Holdings has been and continues to be harmed.

## COUNT II: BREACH OF CONTRACT

### (NON-COMPETITION CLAUSE- ROLLOVER AGREEMENT, GROUP HOLDINGS AGAINST JONES)

42. Plaintiff repeats and realleges the factual allegations in Paragraphs 1 through 41 above.

43. Dr. Jones breached and continues to breach Section 7.3 of the Rollover Agreement by, and without Group Holdings' prior permission or consent, undertaking employment with Dignity Health, in competition with CORE.

44. The actions of Dr. Jones constitute material breaches of the Rollover Agreement.

45. As a result of Dr. Jones's breaches, Group Holdings has been harmed and continues to be harmed.

## COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (RCA, ROLLOVER AGREEMENT, HOPCO HOLDINGS ENTITIES AGAINST JONES)

46. Plaintiff repeats and realleges the factual allegations in Paragraphs 1 through 45 above.

47. A covenant of good faith and fair dealing is implied in every contract in Delaware. By the actions described herein, including but not limited to his breach of his contractual restrictive covenant obligations, Dr. Jones has breached the implied covenant of good faith and fair dealing applicable to all contracts.

48. As a direct and proximate result of Dr. Jones's breaches of the implied covenant of good faith and fair dealing, HOPCo Holdings Entities have suffered and continue to suffer damages and harm.

## PRAYER

WHEREFORE, Plaintiffs pray that the Court enter final judgment and grant the following relief against Defendant:

A. Declare that Dr. Jones breached and continues to breach the RCA Agreement and Rollover Agreement;

B. Enter a preliminary and permanent injunction prohibiting Dr. Jones from participating in any business, including Dignity Health, which engages in a competing business in any geographic area in which HOPCo Holdings Entities or any of its affiliated entities for a period of three (3) years following the closing date of the Merger (as those terms are defined in the RCA and Rollover Agreement);

  C. For an award of actual damages from Dr. Jones, including compensatory and consequential damages, in an amount according to proof, plus interest which continues to accrue thereon;

  D. An award of prejudgment and post-judgment interest;

  E. An award of attorneys' fees and expenses for this action for breach of contract;

  F. Grant such other and further relief as the Court deems just and equitable.

| | |
|---|---|
| *Of Counsel*: | PRICKETT, JONES & ELLIOTT, P.A. |
| | */s/ Bruce E. Jameson* |
| Koray J. Bulut | Bruce E. Jameson (#2931) |
| Hayes P. Hyde | Eric J. Juray (#5765) |
| GOODWIN PROCTER LLP | 1310 King Street |
| Three Embarcadero Center | Box 1328 |
| 28th Floor | Wilmington, DE 19899 |
| San Francisco, California 94111 | (302) 888-6500 |
| (415) 733-6000 | bejameson@prickett.com |
| kbulut@goodwinlaw.com | ejjuray@prickett.com |
| hhyde@goodwinlaw.com | |
| | *Attorneys for Plaintiffs* |
| Dated: May 8, 2020 | |